Dated: June 28, 2010

# THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| RICCO, INC.; ) | Case Nos. 3:10-bk-00023; 3:10-bk-00033 |
| RALPH A. CALANDRELLA and ) | |
| CAROLYN S. CALANDRELLA, ) | |
| ) | |
| Debtors. ) | Chapter 11 |
| ) | |

## MEMORANDUM OPINION

The United States Trustee (the "USTE") seeks the appointment of Chapter 11 trustees in the bankruptcy cases of Ralph and Carolyn Calandrella, and Ricco, Inc., on grounds of gross mismanagement and incompetence. For the reasons stated herein, the court will grant the USTE's motion.

### I. BACKGROUND[1]

Mr. Calandrella has been in the real estate business since 1973. He makes his investments through, *inter alia*, Ricco, a Maryland corporation, which, according to its Chapter 11 petition, has accumulated approximately $14,000,000 in real estate assets. Ricco's assets include mineral rights, security interests in real estate, and equity interests in real estate holding entities. Mr. Calandrella is the sole shareholder and president of Ricco, and has valued the Ricco stock as an asset in his personal bankruptcy case at $6,500,000.

---

[1] In response to certain questions propounded to the Calandrellas by the USTE, the Calandrellas asserted their 5th Amendment privilege against self-incrimination and refused to answer. In rendering this Memorandum Opinion, the court has relied only upon the testimony freely given by the Calandrellas, and has not used or drawn any adverse inferences from their assertion of the privilege against self-incrimination in response to questioning by the USTE.

1

Mr. Calandrella financed his real estate purchases, and that of Ricco's by borrowing, on an unsecured basis, from various individuals. Some notes are issued by him, others by Ricco, and some are in the names of both Mr. Calandrella and Ricco or some other related entity.

Ultimately, Mr. Calandrella's ventures were unable to support the unsecured note payments. Many of Mr. Calandrella's and Ricco's note holders have sued, and some have obtained judgments. In 2009 – before Ricco filed its January 7, 2010 Chapter 11 bankruptcy petition, and before the Calandrellas filed their January 8, 2010 Chapter 11 bankruptcy petition – the judgment holders levied the Calandrellas' and Ricco's deposit accounts. Following the levies, Mr. Calandrella closed his and Ricco's deposit accounts and he operated the Calandrellas' and Ricco's financial affairs by using the cash and deposit accounts of other, related entities.

Despite Mr. Calandrella's extensive investments and network of partnerships, he employs what, euphemistically, is best described as a "shoe-box" record-keeping system. To track accounts payable, he retains copies of the notes he issues, and retains copies of bank statements and canceled checks showing payments made on the notes. To track accounts receivable, in some instances, he merely makes a hand-written notation on the face of the note to reflect his receipt of principal payments. In other instances, he makes hand-written notes on an amortization schedule. He maintains no regular books to reflect the allocation of income and expenses to the entities involved in his various investments. In fact, the last time Mr. Calandrella had an income statement prepared for any of his entities was in 2004 – the last time he prepared tax returns.

Mr. Calandrella's informal method of record-keeping is matched by his informal financial dealings among himself and the entities he controls. Even before he closed the Calandrellas's and Ricco's pre-petition deposit accounts to prevent further levy, he would make informal loans to his companies, take company income for his personal use, and treat the cash of his companies interchangeably. Given Mr. Calandrella's haphazard and ineffective accounting practices, and the distinct lack of financial record-keeping, the professionals hired by the bankruptcy estate are now left to reconstruct several years of financial transactions relying almost entirely on bank statements and Mr. Calandrella's lackluster memory.

Neither the Calandrellas nor Ricco have plans to continue operating their real estate related investments. They have entered into agreements with their respective creditors to freeze

the use of assets except as necessary to propose and consummate Chapter 11 liquidation plans. They have hired a forensic accountant and a title examiner to reconstruct their books and real estate transactions. Ricco has negotiated with the unsecured creditors committee to file a plan that calls for the creation of a liquidation trust, the employment of an independent trustee, and a 100% payoff of all estate creditors within two years from confirmation. Likewise, the Calandrellas propose a plan that includes the creation of a liquidating trust to be administered by a third party trustee that projects to pay 100% of creditors' claims.

## II. DISCUSSION

Despite Ricco's and the Calandrellas' proposed plans to liquidate and pay all creditors 100% of their allowed claims, the USTE believes that a Chapter 11 trustee should be appointed in both cases on the grounds that Mr. Calandrella's conduct in managing the Calandrellas' and Ricco's business affairs shows gross mismanagement and incompetence, both of which are grounds to appoint a Chapter 11 trustee under 11 U.S.C. § 1104(a)(1).

Section 1107(a) of the Bankruptcy Code grants a Chapter 11 debtor the opportunity to control the bankruptcy estate as a "debtor in possession," giving rise to a strong presumption that the debtor's pre-petition management should remain in control of the debtor's business. §§ 1101(a), 1107(a), 1106(a); *In re Heck's Properties, Inc.*, 151 B.R. 739, 755 (S.D.W. Va. 1992). A Chapter 11 debtor's right to control the bankruptcy estate as the debtor in possession, however, is not absolute. *In re Byrd*, No. 04-35620, 2007 Bankr. LEXIS 4126, *34-35 (Bankr. D. Md. Dec. 5, 2007).

A court may limit the Chapter 11 debtor's power over the estate by appointing a trustee. The appointment of a trustee "is an extraordinary remedy, and should be considered as the exception to the general rule that a Chapter 11 debtor remain in possession of its own affairs." *In re Funge Systems, Inc.*, No. 01-12219, 2002 Bankr. LEXIS 1937, *9 (Bankr. E.D. Va. October 17, 2002) (citing *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998)). Grounds to appoint a Chapter 11 trustee are set forth in 11 U.S.C. § 1104(a)(1), and include incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case. The moving party must establish the grounds to appoint a trustee by clear and convincing evidence. *In re Brown*, No. 99-06393, 2000 Bankr. LEXIS 247, *28 (Bankr. E.D.N.C. Feb. 24, 2000). Once cause is

3

established by clear and convincing evidence, the appointment of a trustee is mandatory. *In re TAAF, LLC*, No. 10-171-8, 2010 Bankr. LEXIS 449, *5 (Bankr. E.D.N.C. Feb. 12, 2010).

Regarding gross mismanagement, cause to appoint a trustee is "manifest when creditors may reasonably lose all confidence in the ability of management to direct the reorganization effort." *In re Eagle Creek Subdivision, LLC*, No. 08-4292, 2009 Bankr. LEXIS 632, *11 (Bankr. E.D.N.C. March 9, 2009) (internal quotation marks omitted). The term "incompetence" is not defined in the Bankruptcy Code, but is generally defined as the "state or fact of being unable or unqualified to do something." *Black's Law Dictionary* 780 (8th ed. 2004).

The USTE developed clear and convincing evidence of gross mismanagement and incompetence in support of his motion.

A.   **The Calandrellas**

Regarding the Calandrellas, they failed to file income tax returns for five years, are unaware of their income for each year since 2006, misused loan proceeds and income of Ricco to pay the expenses of other, related entities, used their entities' cash interchangeably, and maintained no recognizable form of accounting. Confusion is rampant. For example, Mr. Calandrella failed to file tax returns for several years, stating that he only choose to file returns for years in which the Calandrellas' income exceeds expenses. According to the Calandrellas' statement of financial affairs, however, the Calandrellas received an estimated $78,000 in payments from Ricco during 2008 and 2009. Nevertheless, no tax returns are filed.[2] Then, at the hearing in this matter, Mr. Calandrella testified that his statement as to the Calandrellas' income on the statement of financial affairs is inaccurate.

In attempting to reconstruct the Calandrellas' finances for purposes of preparing past-due tax returns, a forensic accountant testified that he relied on Mr. Calandrella's memory for assistance. Mr. Calandrella's memory, however, is simply insufficient to address the sheer volume of transactions that affect the Calandrellas' bankruptcy estate. Although the forensic accountant had met with Mr. Calandrella and billed either the Calandrellas or Ricco for 60 hours of work, he learned at the hearing – for the first time – that Mr. Calandrella had operated the Calandrellas' and Ricco's affairs without a bank account for several months pre-petition, and

---

[2]   Carolyn filed a separate return for 2008.

that Mr. Calandrella maintained some amortization schedules. He also learned for the first time that Ms. Calandrella filed a separate tax return in 2008. This shows that the Calandrellas lack the initiative to disclose key information to professionals, and are unable to direct the professionals in gathering the information required to administer the Calandrellas' estate or that of Ricco.

Further, despite his representation that he has some records available that would assist in reconstructing relevant financial and real estate transactions, Mr. Calandrella has been unable to locate those records. In that regard, Mr. Calandrella stated that in order to reconstitute real estate transactions, one would need to go to the courthouse and examine public records due to his inability to find the relevant records. In a similar vein, although he acknowledges that he may have borrowed up to $500,000 over the past five years, he neither can recall any details of the loans, nor locate the records for those transactions. In fact, Mr. Callendrella testified that his knowledge of the liabilities is based merely upon keeping track of them in his head; although, as noted, he was unable to recall any relevant details when asked about them.

Ms. Calandrella testified that she entrusts Mr. Calandrella with all of the family's businesses; thus, practically, Mr. Calandrella is the person in control of the household's financial affairs and the financial affairs of Ricco. Her testimony made clear that she lacks any detailed knowledge of the family's investments and financial affairs. In fact, Ms. Calandrella loaned $60,000 to Ricco, but she does not know the terms of the loan or to what use the money was put. According to her, Mr. Calandrella requested the loan for Ricco and she just gave it to him without any questions. Ms. Calandrella cannot disclaim all responsibility for the financial affairs of the Calandrellas merely by playing ostrich and burying her head deeply enough in the sand. Her own incompetency and gross mismanagement is shown by her complete lack of understanding as to the financial affairs of the household or of Ricco.

In sum, the Calandrellas' ramshackle approach to the management of their finances, including the appalling lack of recordkeeping, is not only deficient, it is manifestly well below any acceptable or reasonable expectation. No excuse was offered for Mr. Calandrella's sloppy practices or his inability to reconstruct relevant financial transactions or locate records. In fact, Mr. Calandrella's testimony was singularly listless and completely unenlightening. The court was left with the impression that he was either purposefully evasive in his answers or highly

inept in his financial affairs, or both. In any event, the upshot of his testimony, and that of Ms. Calandrella, left the court distinctly unimpressed with their ability and motivation to move their case forward. Mr. Calandrella's lack of recall, combined with Ms. Calandrella's ignorance of the their financial affairs, demonstrate by clear and convincing evidence that the Calandrellas have grossly mismanaged their affairs and are incompetent to manage their Chapter 11 bankruptcy estate. In similar circumstances, courts have not hesitated to appoint a trustee. *E.g., Wilmington Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)*, No. 96-412, 1997 U.S. Dist. LEXIS 3304, *11-12 (D. Del. Mar. 4, 1997) (finding an abuse of discretion in the bankruptcy court's denial of a trustee appointment on the grounds that cause existed where the debtor kept inadequate records and failed to file tax returns); *In re TAAF, LLC*, at *10-11 (commingling of assets among entities by debtor's sole manager is cause to appoint a trustee); *In re Eagle Creek Subdivision, LLC*, at *11 (misuse of loan proceeds and commingling assets as cause).

**B.    Ricco**

Because Mr. Calandrella used the same faulty business and accounting practices for Ricco as he used for his household, cause to appoint a trustee in the Ricco case is a mirror image of the Calandrella case. For example, Ricco too, under the management auspices of Mr. Calandrella, failed to file income tax returns for five years, misused its money to pay the expenses of other, related entities, and maintained no recognizable form of accounting. Regarding Mr. Calandrella's stated practice to only file a tax return in a year when Ricco's income exceeded its expenses, Ricco's statement of financial affairs reflects that Ricco received an estimated $92,400 in income from note payments in years 2008 and 2009, yet no tax returns have been filed for either year. Ricco's records of accounts are in the same confused state of affairs as the Calandrellas' family records. And reliance on Mr. Calandrella's memory to reconstruct Ricco's books is just as forlorn as in the Calandrellas' case, because, for instance, Mr. Calandrella could not recall in his testimony any details of the various loans made to Ricco.

In deciding whether to appoint a Chapter 11 trustee for a corporate debtor, some mistakes of past management can be corrected post-petition. 7 *Collier on Bankruptcy* ¶ 1104.02[c][3][i] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010); *In re Eagle Creek Subdivision, LLC*, at *7 ("[W]hen current management has been tainted by the misdeeds of prior management, the court may also consider the actions of prior management."). In this case,

however, Mr. Calandrella's mismanagement (both pre- and post-petition) continues to permeate the administration of Ricco's bankruptcy estate. Thus, for the same reasons that the court has found that the Calandrellas are incompetent to manage their own financial affairs, and based on the Calandrellas' own gross management of their personal affairs, so too is the continued administration of Ricco's estate at the hands of Mr. Calandrella untenable. In short, Mr. Calandrella has grossly mismanaged the affairs of Ricco and is incompetent to continue any further business dealings on behalf of Ricco.

### III. CONCLUSION

In fashioning proposed liquidating Chapter 11 plans for the Calandrellas and Ricco, counsel for those estates have made an admirable attempt to ameliorate the pre-petition concerns raised by the USTE in his motion, but that attempt is insufficient to overcome the clear and convincing evidence adduced at the hearing that demonstrated incompetence and gross mismanagement. To find that a Chapter 11 trustee should not be appointed in these related cases would require the court to either ignore the mandatory requirement of § 1104(a)(1), or to attempt an end run around it, something the court is not authorized to do.

For the above-stated reasons the court will enter separate orders for the appointment of trustees in the Calandrellas' and Ricco's Chapter 11 cases.[3]

---

[3] The court will also grant applications of the Calandrellas and Ricco to employ bankruptcy counsel from the date of their respective bankruptcy filings to the date of the entry of this Memorandum Opinion.